IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| SYLVIA BENAVIDES, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 1:20-CV-1218-RP |
| | § | |
| TEXAS DEPARTMENT OF FAMILY AND | § | |
| PROTECTIVE SERVICES, | § | |
| | § | |
| Defendant. | § | |

## ORDER

Before the Court is a motion for summary judgment filed by Defendant Texas Department of Family and Protective Services ("DFPS"). (Dkt. 62). Plaintiff Syliva Benavides ("Benavides") filed a response. (Dkt. 63). DFPS did not file a reply. Having considered the parties' arguments, the factual record, and the relevant law, the Court will deny DFPS's motion.

## I. BACKGROUND

DFPS is a state agency responsible for investigating cases of child abuse and neglect in Texas. (Mot. Summ. J., Dkt. 62, at 5). On June 30, 2008, DFPS hired Benavides as an Investigator. (3d. Am. Compl., Dkt. 33, at 3). In 2012, DFPS promoted her to the job of Special Investigator, a more specialized role designed to help DFPS with high profile or high-risk cases. (DFPS Job Description, Dkt. 63-3, at 1). Rather than work cases from start to finish, Benavides performed discrete tasks like researching criminal histories, locating victims and witnesses, testifying in court, and serving as a liaison with law enforcement. (Benavides Dep., Dkt. 63-4, at 4–6). As an experienced special investigator, Benavides states that she carried a heavy caseload and handled significantly more cases than her peers. (Pl.'s Resp., Dkt. 63, at 2). To that end, on June 10, 2016, her supervisor Jennifer Ruiz ("Ruiz") noted that she "will be spread very thin" due to her workload. (Ruiz Email, Dkt. 63-5, at 2).

Four days after Ruiz's email, Benavides was in a serious car accident while driving to court as part of her work for DFPS. (Accident Report, Dkt. 63-6, at 1–3). She suffered several injuries that required her to exhaust her available leave. (Leave Report, Dkt. 63-7, at 1). She was cleared to return to work on September 28, 2016 with the restriction that she could not drive after dark. (Worker's Comp. Report, Dkt. 63-8). Ruiz gave her a temporary light duty assignment from October 20, 2016 to November 11, 2016. (THHSC Assignment, Dkt. 63-9). The assignment had a limit of 40 hours per week, but otherwise entailed Benavides's standard special investigative duties. (Ruiz and Benavides Emails, Dkt. 63-10). On December 1, 2016, Benavides received a 27% pay increase. (Salary Table, Dkt. 63-2, at 2).

On January 30, 2017, Benavides was given a full release to return to work. (Carter Email, Dkt. 63-11, at 2). However, she was denied worker's compensation for two neurological medications and emailed DFPS to ask for an explanation as to why the medications were not covered. (*Id.*). Benavides reports that she continued to work a heavy case load. Between February 1, 2017 and March 30, 2017, Benavides handled 33 cases. (Case Table, Dkt. 63-12, at 2). In a deposition, one of Benavides's supervisors confirmed that this amount was above average and stated that a typical case load for a special investigator was "maybe eight to 12, maybe seven to 15 cases." (Wychopen Depo., Dkt. 63-13, at 13). A DFPS table tracking special investigator caseloads from 2016 to 2017 shows that Benavides had 33 cases, while other special investigators had 14, 26, 24, 29, and 25 cases, respectively. (DFPS Special Investigator Table, Dkt. 63-14). On April 7, 2017, Benavides received a performance review that stated she "meets expectations" in every category reviewed. (Performance Review, Dkt. 63-15, at 2–4). The performance review specifically noted that she met expectations in performing each essential job function listed on the form. (*Id.*).

A month later, however, on May 17, 2017, Ruiz met with Benavides and told her that she had overdue documentation in three cases. (Conference Notes, Dkt. 63-16, at 3). Ruiz issued

Benavides a developmental plan and instructed her that she was being transferred to a new office much further from her house. (*Id.*). Benavides told Ruiz that she thought the counseling session was punishment for her open worker's compensation case and medical problems stemming from her accident. (*Id.*). On May 22, 2017, Ruiz issued another developmental plan related to a comment she made at work about another case about a caseworker taking the "knife out of her back." (DFPS Conference Notes, Dkt. 63-18, at 2–4). Benavides said that the comment was a joke with the coworker, and again stated that the disciplinary conference was retaliation for her worker's compensation case. (*Id.*).

On June 5, 2017, Benavides spoke with the Special Investigations Program Administrator Marshall Davidson ("Davidson") about her developmental plan. (Davidson Dep., Dkt. 63-19, at 4). Davidson had never met Benavides. (*Id.*). Benavides stated that she was having lingering impacts from her car accident, including occasional issues with her memory and agitation. (Davidson Aff., Dkt. 62-1, at 4). Davidson, on his own accord, then emailed Benavides a DFPS form to request an accommodation. (Davidson Email, Dkt. 63-21, at 2). That same month, DFPS changed Benavides's supervisor from Ruiz to Stacey Wychopen ("Wychopen"). DFPS terminated Ruiz's employment later that year for improperly accessing case files on behalf of a relative and lying about it to Davidson. (Davidson Dep., Dkt. 63-19, at 5–6).

On June 27, 2017, Benavides submitted a reasonable accommodation request to the Texas Health and Human Services System Civil Rights Office ("CRO"), alleging that she was suffering from intense pain, headache, vertigo, and other symptoms of chronic pain. (Accommodation Req., Dkt. 63-22, at 2). The request once again faulted her pain on the denial of her worker's compensation for treatment that could help. (*Id.*). Benavides stated that she would sometimes suffer pain so intense that she would "stop what [she is] doing" and has "forgotten what [she] was doing,

3

and [has] to start over." (*Id.*). However, Benavides states that she made no other references to her memory in her communications to DFPS. (Pl.'s Resp., Dkt. 63, at 4).

However, before the CRO independently reviewed the request, Davidson instructed the CRO to deny the accommodation. (Davidson Letter, Dkt. 63-22, at 4–5). Davidson stated that "there is no light duty" for a special investigator. (*Id.* at 4). He said, "I believe there are [sic] no assignment and or light duty that would qualify as an appropriate accomadation [sic], and feel that the clients would be placed in harms [sic] way due to Ms. Benavides [sic] medical issues that she has now claimed." (*Id.*). Davidson argued that special investigators must have a "sharp memory" and any single lapse could "leave a child in an unsafe situation." (*Id.*). Because Benavides suffered occasional memory lapses, Davidson argued she could not perform the job's essential functions. (*Id.*). In his deposition, Davidson stated that he had never evaluated her medical or memory issues face-to-face with Benavides. (Davidson Dep., Dkt. 63-22, at 7–9). When asked if he believed she was a danger to children, he stated that the question was "kind of debatable" because she had not been documenting her cases. (*Id.*).

Benavides states that, as part of her accommodation request, she asked for a "reduced" caseload insofar as it would match the caseload of her other peers. (Benavides Dep., Dkt. 63-4, at 10). However, the CRO denied her request for accommodation and began considering reassignment. (Denial of Accommodation, Dkt. 63-23, at 2). A CRO employee, Tonya Stehle ("Stehle"), stated that "it has been identified that [Benavides is] no longer able to do the essential functions" of her job and asked that she review other openings at DFPS. (Stehle Email, Dkt. 63-24, at 2).

On June 28, Benavides visited a physician who evaluated that she had a permanent physical impairment of 9% based on damage to her cervical spine and right shoulder. (Dr. McWatt Report, Dkt. 63-25, at 2). The same day, Davidson told Benavides that she should shadow a less experienced

special investigator, Lisa Jones ("Jones"), and would not be allowed to work independently. (Davidson Email, Dkt. 63-26, at 2). Benavides responded with confusion as to why she would be asked to shadow a special investigator "with only a few months of experience" when she had "9 years of experience." (*Id.*). Benavides agreed to shadow Jones, and was asked to help with database searches, but noted that she was "bored" in the shadowing role. (Jones Email, Dkt. 63-28). During that shadowing time, at least one other special investigator asked that Benavides be tasked to help out with another pending case. (Moro'n Email, Dkt. 63-27, at 2).

On August 10, 2017, Stehle informed Wychopen that Benavides's accommodation request was on hold pending a completed form from her neurologist. (Dkt. 63-29, at 3). Wychopen forwarded the email to Davidson, who responded, "Ok, this is dragging on forever[.]" Wychopen responded, "I so agree[.]" (Wychopen-Davidson Emails, Dkt. 63-29, at 2).

In September 2017, Stehle informed Wychopen that she could "go ahead and start adding back in [Benavides's] job duties and monitoring her progress and ability to do her essential functions." (Stehle Email, Dkt. 63-30, at 2). Wychopen replied, "Per [Program Administrator] Marshall Davidson that will not happen due to her memory loss and this puts children at risk." (*Id.*). In her deposition, Wychopen stated that she did not recall why Benavides put children at risk but instead "was given a directive" from Davidson on the matter. (Wychopen Dep., Dkt. 63-13, at 9).

On October 11, 2017, DFPS informed Benavides that her reasonable accommodation request was being closed. (DFPS Letter, Dkt. 63-31, at 2–3). It stated that Benavides was "unable to perform the essential functions of [her] current position with or without a reasonable accommodation." (*Id.*). DFPS noted that Benavides declined alternative positions. (*Id.*). However, Stehle then characterized the "alternative" positions as an unwillingness to "voluntary[il]y demote." (Stehle Email, Dkt. 63-32, at 2).

On October 16, 2017, Davidson emailed Wychopen and instructed her to draft a letter terminating Benavides. (Dkt. 63-34, at 2 ("I need a memo today on [Benavides]. Go back to when we were looking at discipline, and the issues there, then explain the civil rights actions. Don't make it too long, but enough. I will edit and let you see that before we do anything.")). Davidson attached a memo from a previous employee's termination as a template. (*Id.*).

Wychopen then sent Davidson a memo recommending Benavides's termination. (Mem., Dkt. 63-35, at 2). However, in her deposition, Benavides testified that "Davidson drafted this memo." (Wychopen Dep., Dkt. 63-13, at 10). Davison testified that "Wychopen recommended [termination] and I agreed with that recommendation." (Davidson Dep., Dkt. 63-19, at 11). That same day, Davidson told Benavides she would "be fired in a couple of days." (Benavides Email, Dkt. 63-36, at 2).

However, Davidson's remark turned out to be premature. Benavides filed a second request for accommodation on October 17, 2017. The CRO again declined to grant Benavides an accommodation, holding without analysis that she could not perform the essential job functions of a special investigator and that reassignment was not feasible. (CRO Letter, Dkt. 63-38).

Benavides contends that the offers for reassignment were not serious. When she called to be considered for six of the positions that CRO said were available, Stehle then noted that they had actually been filled, that one had been canceled, and that she was unqualified for the other two. (*Id.*). DFPS terminated Benavides's employment on December 13, 2017. (Termination Letter, Dkt. 63-39).

On December 14, 2020, Benavides filed suit. (Compl., Dkt. 1). The Court dismissed Benavides's Americans with Disabilities Act ("ADA") and Texas Labor Code claims and allowed Benavides to replead her Rehabilitation Act ("Rehab Act") claims. (Order, Dkt. 11). On April 18, 2022, Benavides filed her third amended complaint—the live pleading in this case. DFPS again

moved to dismiss, this time on the basis that Benavides could not perform the essential functions of her job, was not denied accommodations, and was not discriminated solely on the basis of her disability. (Mot. Dismiss, Dkt. 38). The Court denied the motion in full on December 29, 2022, noting that Benavides had viably pled an ability to perform the job's essential functions and a failure to accommodate. (Order, Dkt. 47).

On November 2, 2023, DFPS moved for summary judgment. (Dkt. 62). DFPS again argues that Benavides is not a qualified individual because she cannot perform the essential functions of her position. (*Id.* at 7–8). Next, DFPS argues that Benavides did not properly request accommodations. (*Id.* at 13–17). Finally, DFPS argues that there is no evidence she faced discrimination "solely" on the basis of her disability. (*Id.* at 17–19).

## II. LEGAL STANDARD

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure only "if the movant shows there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). "A fact issue is 'material' if its resolution could affect the outcome of the action." *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]he moving party may [also] meet its burden by simply pointing to an absence of evidence to support the nonmoving party's case." *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 544 (5th Cir. 2005). The burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986);

*Wise v. E.I. Dupont de Nemours & Co.*, 58 F.3d 193, 195 (5th Cir. 1995). After the nonmovant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted. *Miss. River Basin Alliance v. Westphal,* 230 F.3d 170, 175 (5th Cir. 2000). Courts must view the summary judgment evidence in the light most favorable to the nonmovant. *Rosado v. Deters*, 5 F.3d 119, 123 (5th Cir. 1993).

## III. DISCUSSION

"To qualify for relief under the Rehabilitation Act, a plaintiff must prove that (1) [she] is an 'individual with a disability'; (2) who is 'otherwise qualified'; (3) who worked for a 'program or activity receiving Federal financial assistance'; and (4) she was discriminated against 'solely by reason of [her] disability.'" *Hileman v. City of Dallas*, 115 F.3d 352, 353 (5th Cir. 1997) (quoting 29 U.S.C. § 794(a)). DFPS's motion raises three arguments: (1) Benavides was not a qualified individual, (2) Benavides did not request accommodation, and (3) Benavides was not discriminated against solely because of her disability. The Court will address each in turn.

### A. Qualified Individual

To state a claim under the Rehab Act, a plaintiff must show that she is a qualified individual with a disability. DFPS focuses its arguments on Benavides's qualification. A plaintiff is "otherwise qualified" if she could perform the essential functions of her job with or without a reasonable accommodation. *Burciaga v. West*, 996 F. Supp. 628, 636 (W.D. Tex.), *aff'd sub nom. Burciaga v. Caldera*, 162 F.3d 94 (5th Cir. 1998). If a plaintiff cannot perform the essential functions of her job without an accommodation, then the question becomes whether any reasonable accommodation would enable the employee to perform those functions. *Florence v. Runyon*, 990 F. Supp. 485, 491 (N.D. Tex. 1997).

1. Essential Functions

"Essential functions" are those duties that are fundamental to the job at issue. *Kapche v. City of San Antonio*, 176 F.3d 840, 843 (5th Cir. 1999). Courts must give consideration to an employer's judgment as to what functions of a job are essential, and the description "shall be considered evidence of the essential functions of the job." *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 697 (5th Cir. 2014) (quoting 42 U.S.C. § 12111(8)). "The inquiry into whether a particular function is essential initially focuses on whether the employer actually requires employees in the position to perform the functions that the employer asserts are essential." *Id.* at 698 (quoting Interpretive Guidance on Title I of the Americans With Disabilities Act, 29 C.F.R. pt. 1630, app. § 1630.2(n)).

DFPS alleges multiple different essential functions of a special investigator, including:

- Investigating cases that are high profile or high risk;
- Conducting in-depth interviews to accurately obtain information to determine risk of abuse or neglect;
- Assessing family dynamics to determine agency intervention;
- Preparing case documentation and testifying in court if necessary;
- Reviewing cases for specific risk factors or assistance with forensic investigation techniques;
- Accompanying DFPS staff on investigations and law enforcement procedures; and
- Training staff on forensic interview skills and techniques.

(Mot. Summ. J., Dkt. 62, at 8–9; Davidson Decl., Dkt. 62-1.)

DFPS, however, focuses almost exclusively on Benavides's ability to drive, which is not otherwise in its list of essential functions. (Mot. Summ. J., Dkt. 62, at 10 ("One of the essential job functions of a Special Investigator is a significant amount of time driving on Texas roadways . . . . And, [Benavides] admits that she has serious problems performing this essential function.")). Although driving is not listed as an essential function, DFPS argues that it was central to the role of a special investigator, and that Benavides was unable to safely drive. (*Id.*).

DFPS's evidence on this point is insufficient to show beyond any material dispute that Benavides could not drive a vehicle. DFPS quotes a deposition where Benavides states that her eyes

are "very sensitive to light, especially sunlight and headlights," that medication cannot help, and that "oncoming headlights" exacerbate her severe headaches. (*Id.* at 11). Increased sensitivity to headlights does not immediately equate to the inability to drive. It would be improper for this Court to draw the (disputed) inference that Benavides's pain from looking at oncoming headlights automatically rendered her unable to drive. *See Rizzo v. Children's World Learning Centers, Inc.*, 84 F.3d 758, 764 (5th Cir. 1996) ("To determine whether a particular individual performing a particular act poses a direct risk to others is a matter for the trier of fact to determine after weighing all of the evidence about the nature of the risk and the potential harm.").

Similarly, DFPS faults Benavides for getting "overwhelmed" in traffic as she tried "to get away from [big trucks] as soon as [she] can." (*Id.* at 12). Again, the desire to avoid big trucks in traffic is different from the inability to drive safely. To the contrary, a reasonable juror might find that the accident and desire to avoid large trucks made Benavides a more cautious and defensive driver. At most, DFPS's evidence calls into question Benavides's ability to drive, but her ability to do so safely remains a question of fact for the jury to decide. *Rizzo*, 84 F.3d at 764.

Indeed, countervailing evidence tends to support Benavides's ability to drive. First and foremost, Benavides drove for several months after her accident as a special investigator during the daytime. (Offer of Employment, Dkt. 63-9, at 2). During this time, and after her transition back to being a full-time special investigator up until May 2017, DFPS made no mention of her inability to safely drive. Her performance review noted that she met expectations with all essential functions. (Evaluation, Dkt. 63-15). Ruiz, her supervisor during her transition back to being full-time, made no mention of the alleged inability to drive. (*Id.*). DFPS's internal correspondence makes no mention of driving. (Pl.'s Resp., Dkt. 63, at 12). CRO did not deny her accommodation request on the basis of driving. (*Id.*). Davidson's own affidavit submitted for the purposes of this motion does not state that

Benavides could not drive. (Davidson Decl., Dkt. 62-1). In sum, there is a very genuine dispute as to whether Benavides could safely drive.

Moreover, while the Court accepts that driving during the workday was an essential function of special investigators for the purposes of argument, DFPS has presented no compelling evidence regarding driving at night. Davidson states that driving functions "are carried out day or night" and "immediate action is needed no matter the time of day." (Davidson Decl., Dkt. 62-1, at 3). Again, this is contradicted by Benavides's performance when she was limited to driving at daytime, during which time there is no indication that she failed to perform essential functions. (Evaluation, Dkt. 63-15). And DFPS presents no evidence that driving at night was a written job description, is a common occurrence, or is part of other employee's work experiences. 29 C.F.R. § 1630.2(n)(3). Indeed, the best evidence for whether a function is "essential" is whether "the employer *actually requires* employees in the position to perform the function." *LHC Grp.*, 773 F.3d at 698. DFPS has pointed to no evidence of it requiring a special investigator to drive at night. To the extent Davidson's own declaration suggests a hypothetical situation might arise at night, it is insufficient to show that possibility makes it an "essential" function.

Benavides's own evidence suggests that DFPS terminated her employment for altogether different issues. Davidson's letter to the CRO encouraging them to deny the accommodation request, for example, faulted Benavides's memory—not her ability to drive. (Davidson Letter, Dkt. 63-22, at 4). It states that "memory lapses" could "have potentially already put countless children and adults at risk of harm." (*Id.* at 4). It is difficult to accept, as a matter beyond any dispute, that Benavides could not safely drive when Davidson's letter, explaining why she could not perform essential functions, entirely omitted any mention of driving.

Finally, the Court notes that DFPS's failure to consider her inability to drive during the final months of her employment is fatal to their summary judgment motion. If DFPS had raised the

inability to drive at night as the specific essential function that she could not perform, then it was obligated to attempt to find a reasonable accommodation that would allow her to perform that function. But because DFPS did not raise the issue, it appears not to have conducted a reasonable accommodation analysis on the matter, much less engage in the interactive process.

### 2. Direct Threat

DFPS's arguments appear more aligned with the Rehab Act's "direct threat" inquiry. In *Sch. Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 276 (1987), the Supreme Court held that a person with disabilities may still receive protection under the Rehab Act so long as they do not pose a significant risk to the safety of others. *See* 29 C.F.R. § 1630.2(r) (regulating definition of "direct threat"). Although DFPS never uses the term "direct threat," its summary judgment motion appears to argue in substance that Benavides posed a threat to the safety of others. DFPS argues both that she could not drive without posing a threat to others and that her memory lapses would put children at risk due to the nature of her work as a child abuse investigator. (*See* Mot. Summ. J., Dkt. 62, at 12 ("Simply stated, [Benavides] cannot perform various essential job functions of a Special Investigator IV, because she cannot safely travel to perform those functions. It would be utterly derelict and reckless for DFPC to allow [Benavides] to drive on the roadways . . . let alone allow children to be put into a vehicle with her.")).

The "direct threat" standard is not lightly met. Applicable regulations define "direct threat" as "a *significant risk of substantial harm* to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation. The determination that an individual poses a 'direct threat' shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job." 29 C.F.R. § 1630.2(r) (emphasis added); *Rizzo*, 84 F.3d at 763 (noting same). The Supreme Court has cautioned that such regulations should not be based on mere attitudes or beliefs, and regulations require the determination be made through on

"current medical knowledge" or "the best available objective evidence." *See Sch. Bd. of Nassau Cnty.*, 480 U.S. at 287 (noting that detailed factual findings on direct threat are "essential if [the Rehab Act] is to achieve its goal of protecting handicapped individuals from deprivations based on prejudice, stereotypes, or unfounded fear"); 29 C.F.R. § 1630.2(r).

DFPS's direct threat argument fails for several reasons. First, the argument—as it related to driving—never appeared in any of DFPS's pre-termination discussions. (*See* Pl.'s Resp., Dkt. 63, at 3–7). DFPS cannot have made an individualized determination of Benavides's driving if it did not consider the issue at all when it fired her. Second, to prevail on a direct threat argument, a defendant "must prove that [the plaintiff] is a direct threat as a matter of law." *Rizzo*, 84 F.3d at 764. DFPS cites no cases holding that sensitivity to headlights or fear of large trucks is a "direct threat as a matter of law," nor is the Court aware of any.

Third, even if the job occasionally entailed nighttime drive, the direct threat assessment includes assessment of the duration of the risk, the nature and severity of the potential harm, the likelihood that the potential harm will occur, and the imminence of the potential harm. 29 C.F.R. § 1630.2(r); *Sch. Bd. of Nassau Cnty., Fla.*, 480 U.S. at 288. Again, DFPS made no such findings. And the factors do not appear to weigh in their favor, as the duration, likelihood, and imminence of the risk are all small. The hypothetical possibility that Benavides might need to drive at night to assist a child who cannot receive help from any other emergency service and that Benavides's sensitivity to headlights will cause an accident during this task is far too conjectural for the Court to hold it constitutes an undisputed, unequivocal threat. Indeed, guidance promulgated under the Rehab Act specifically states,

> An employer, however, is not permitted to deny an employment opportunity to an individual with a disability merely because of a slightly increased risk. The risk can only be considered when it poses a significant risk, i.e., high probability, of substantial harm; a speculative or remote risk is insufficient.

29 C.F.R. pt. 1630, app. § 1630.2(r).

Finally, even if the question did lean in DFPS's favor, it would still be a question of fact for the jury to decide. *See Hernandez v. W. Texas Treasures Est. Sales, LLC*, 79 F.4th 464, 470 (5th Cir. 2023) (direct threat inquiry is a "complicated, fact intensive determination, not a question of law"). To the extent DFPS has raised the direct threat issue at all as to driving, the question is not for this Court to decide at summary judgment.

DFPS also appears to suggest that Benavides posed a direct threat because her memory lapses risked hindering child abuse investigations, which Benavides emphatically contests. (Mot. Summ. J., Dkt. 62, at 13; Pl.'s Resp., Dkt. 63, at 13–15). During Benavides's termination, Davidson told the CRO that Benavides posed a threat to the safety of others: "There is no position within the division where sharp memory is not needed to ensure the safety of [children]." (Davidson Decl., Dkt. 62-1, at 2).

Davidson and DFPS's argument is quite dubious on its face. Virtually every employee in any office suffers from occasional memory lapses or distractions—Davidson himself testified some form of "I don't recall" four times in one page of his deposition. (Davidson Dep., Dkt. 63-19, at 4). Every employee forgets details, but that does not automatically render them unqualified to do their jobs. Even accepting that Benavides suffered relatively worse memory loss, DFPS has not offered sufficient proof that the associated risk to children was significant or substantial. To the contrary, their own exhibit from Benavides's neurologist states that "[t]here is no medical basis at this time for concluding that she can not [sic] perform the essential functions of her position as a special investigator." (Neurologist Letter, Dkt. 62-4, at 2). And again, evidence is lacking because Davidson and DFPS entirely neglected to conduct a meaningful direct threat analysis. Indeed, Davidson's email strongly suggests he acted under a potential misapprehension of federal law, terminating Benavides because she posed a substantial risk to children without ever analyzing whether that risk

was significant or likely to occur. (Davidson Email, Dkt. 63-30, at 2). A finder of fact could easily determine that Benavides's occasional memory lapses did not rise to the level of a direct threat.

In sum, DFPS has not shown that Benavides failed to perform the essential functions of Special Investigator or that she posed a direct threat to others at her job. Accordingly, the Court finds that Benavides's status as a qualified individual must be decided by the jury.

### B. Reasonable Accommodation

The Court next turns to DFPS's argument that it could not have reasonably accommodated her disability. (Mot. Summ. J., Dkt. 62, at 13). To prevail on a failure to accommodate claim, a plaintiff must prove that (1) she is a qualified individual with a disability, (2) the disability and its consequential limitations were known by the covered employer and (3) the employer failed to make a reasonable accommodation for such known limitations. *Feist v. Louisiana Dep't of Just., Off. of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013). Regarding reasonable accommodations, the Rehab Act and ADA provide functionally equivalent standards. *Pinkerton v. Spellings*, 529 F.3d 513, 516 (5th Cir. 2008). In her deposition, DFPS's counsel asked Benavides what accommodations would allow her to perform her job, and she responded that she could take a reduced caseload or be transferred to a different office located in Collin County, Texas. (Benavides Dep., Dkt. 62-2, at 19).

As a general matter, employers are not required to create light duty workloads as a reasonable accommodation. *See Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1094 (5th Cir. 1996) ("[Defendant] is not required to create light duty jobs to accommodate disabled employees."); *Wade v. Brennan*, 647 Fed. Appx. 412, 417 (5th Cir. 2016) (unpublished) (noting same). In Benavides's case, however, she did not ask for a lighter caseload than her peers. Rather, Benavides was allegedly being assigned significantly more work than her peers. Benavides states, with accompanying DFPS records, that DFPS employees assigned her many more cases to handle than other special investigators. (Pl.'s Resp., Dkt. 63, at 15; DFPS Case Table, Dkt. 63-14). DFPS alleges that her

caseload was higher because she was letting cases linger, but its evidence for that statement is a single unsupported statement from Davidson that he heard this fact from someone else. (Mot. Summ. J., Dkt. 62, at 14; Davidson Decl., Dkt. 62-1, at 4). And the statement is contradicted by the fact that DFPS gave Benavides a 27% pay raise in late 2016—during the same time it claims that she was struggling to perform her job. (Pay Chart, Dkt. 63-2, at 2). Given these competing narratives about why Benavides had a higher caseload, the Court finds a genuine dispute of fact on the matter.

At the summary judgment stage, the Court must view the facts in Benavides's favor, and therefore accepts that Benavides was assigned and handled significantly more cases than her peers. *Rosado*, 5 F.3d at 123. Acknowledging this as true, DFPS's argument that it did not need to accommodate Benavides by matching her caseload to other special investigators misses the mark. DFPS has not shown that the accommodation which they refused to provide—an equivalent workload to her peers—was related to an essential function of her job.

The problem arises because DFPS cannot show that that exceeding the workload of the average special investigator is an essential function of a special investigator. An *essential* function cannot be consistent above-average performance.[1] DFPS can show that Benavides struggled to *exceed* the essential functions of her job, by highlighting occasional memory lapses with her greater workload. But that does not show that Benavides would have been unable to perform an average workload. It is a reasonable assumption that Benavides would not have suffered from the same paperwork delays or memory lapses if she had been assigned a lower workload that was commensurate with her peers. However, DFPS appears to never consider that possibility, because when Benavides asked for an average workload to aid in her ongoing medical issues, DFPS refused. (Denial of Accommodation, Dkt. 63-23, at 2).

---

[1] Put another way, it is mathematically impossible for an employer to *require* that each employee exceed the median workload.

DFPS argues that because Benavides requested an accommodation and the agency refused on the basis that it was not feasible, that she was properly terminated. (Mot. Summ. J., Dkt. 62, at 13–15). This is error—DFPS has not shown that Benavides was unable to perform the essential functions of her job even without an accommodation. After talking about her paperwork delays, Davidson instructed Benavides to submit her a request for accommodation. (Davidson Email, Dkt. 63-21, at 2). DFPS then denied the request, apparently with the reasoning that reducing workload is not a reasonable accommodation. However, Benavides's request to carry a commensurate workload did not implicate an essential function, because exceeding the average workload of similarly situated employees by definition cannot be essential. Therefore, when DFPS denied her accommodation request and terminated her employment, it failed to properly consider whether she still could perform just the essential functions of her job without accommodation.[2]

If, in the alternative, the Court did consider the request for an average caseload as an accommodation for an essential function, a material dispute would still exist in the parties' factual record. DFPS argues that it would have been unreasonable to offer a reduced workload, but its citations on the matter are inapplicable. The Fifth Circuit has held that a defendant "is not required to *create light duty jobs*" and that the law "does not require affirmative action in favor of individuals with disabilities." *Turco*, 101 F.3d at 1094 (emphasis added). But providing employees in the same job position with the same approximate caseload is neither affirmative action nor a light duty job. Nor does DFPS explain why doing so would have been an undue hardship. (Mot. Summ. J., Dkt. 62, at 13-15).

---

[2] To state the matter another way, an employer cannot assign a disabled employee significantly more work than her peers, fault her for delays in her work on the basis of her disability without mentioning her higher workload, and then fire her on the basis that federal law does not require an employer to reduce a disabled person's workload.

Indeed, the record tends to reflect a dispute on the possibility of reasonable accommodations. DFPS's CRO appears to have believed that Benavides could return to her job with monitoring. (Stehle Email, Dkt. 63-30, at 2 ("[S]ince [Benavides] has been released for full duties, program can go ahead and start adding back in her job duties and monitoring her progress and ability to do her essential functions . . . .")). Davidson overruled that determination, stating it "will not happen due to her memory loss[.]" (*Id.*). DFPS cannot validly claim that it was unreasonable to accommodate her when Davidson appears to have outright rejected the possibility that *any* accommodation would allow her to perform the job's essential functions. Finally, as to nighttime driving, DFPS gives no indication that it considered any accommodation at all.

Turning to reassignment, the Court likewise finds that a material dispute exists. DFPS states that it "diligently attempted to work with [Benavides] . . . to offer alternative employment opportunities which [Benavides] rejected." (Mot. Summ. J., Dkt. 62, at 16). However, Benavides argues that these efforts were disingenuous—DFPS had already filled several positions it had offered to her. (Pl.'s Resp., Dkt. 63, at 15–16). Critically, a genuine dispute about reassignment exists because Davidson had already told Benavides she would be fired prior to the adjudication of her second accommodation request. A jury could readily believe that DFPS did not legitimately consider Benavides for reassignment after Davidson, a DFPS program administrator, had already pushed for Benavides to be terminated and complained that her accommodation request "was dragging on forever[.]" (Davidson Email, Dkt. 63-29, at 20).

### C. Discrimination *Solely* Based on a Disability

Because Benavides brings this action under the Rehab Act, she must show that DFPS discriminated against her "solely" on the basis of her disability. *Soledad v. U.S. Dep't of Treasury*, 304 F.3d 500, 504 (5th Cir. 2002). DFPS argues that Benavides alleges in her complaint only that she was discriminated on the basis of her disability, and not "solely" on the basis of her disability. (Mot.

Summ. J., Dkt. 62, at 18). They further allege that discrimination *solely* on the basis of disability is contradicted by Benavides's initial claim to the E.E.O.C. that DFPS also discriminated her based on her age. (*Id.*).

DFPS's arguments are unavailing. As to the omission of "solely" in the complaint, the Court has already held that it does not defeat Benavides's claim and adopts the same holding for the reasons laid out in its previous order. (Order, Dkt. 47, at 10). As to the E.E.O.C. pleading, it is not clear that Benavides succeeded on her age discrimination claim. Beyond the fact that she sought damages for multiple claims, there is no evidence that she did actually suffer age discrimination. Second, the federal rules recognize that inconsistent, mutually exclusive pleadings do not cancel each other out. *See* Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency."); *Laurence v. Atzenhoffer Chevrolet*, 281 F. Supp. 2d 898, 900 (S.D. Tex. 2003) ("Although parties are barred from recovering damages based on mutually exclusive theories . . ., parties can properly plead alternative, inconsistent theories of liability and can properly argue alternative claims to the jury.") (citing *Robertson v. Bell Helicopter Textron*, 32 F.3d 948, 952–53 (5th Cir. 1994)). Third, Davidson's emails show that Benavides's disability was arguably the sole cause of her termination. Davidson directly stated that "due to her memory loss" she "puts children at risk" and denied accommodating her on those grounds. (Davidson Email, Dkt. 63-30, at 2). DFPS waited until her second reasonable accommodation request was declined to officially terminate her employment. (Termination Letter, Dkt. 63-39). And of course, DFPS's own motion argues that she was properly terminated because her disability—and only her disability—left her unable to do her job. (Mot. Summ. J., Dkt. 63, at 7–13).

## IV. CONCLUSION

Based on the evidence presented in the record, the Court finds genuine disputes regarding whether Benavides could perform the essential functions of a special investigator, whether DFPS offered reasonable accommodations, and whether she suffered discrimination solely on the basis of her disability. Accordingly, DFPS's Motion for Summary Judgment, (Dkt. 62), is **DENIED**.

**SIGNED** on December 4, 2023.

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE